| | | |
|---|---|---|
| LATREECE JONES, individually, and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 1:21-cv-3217 |
| NATIONSTAR MORTGAGE LLC d/b/a MR. COOPER GROUP, | ) ) ) | |
| Defendant. | ) | Jury Trial Demanded |

# CLASS ACTION COMPLAINT

Plaintiff LATREECE JONES ("Plaintiff"), individually, and on behalf of all others similarly situated, by and through counsel at Zimmerman Law Offices, P.C. and DannLaw, brings this Class Action Complaint ("Complaint") against Defendant NATIONSTAR MORTGAGE LLC d/b/a MR. COOPER GROUP (hereinafter "Defendant" or "Nationstar"), as follows:

## PARTIES

1.     Plaintiff is a natural person and, at all times relevant herein, was resident and citizen of Cook County, Illinois.

2.     Defendant is a limited liability company formed and existing under the laws of the state of Delaware.  Its principal office is located at 8950 Cypress Waters Blvd., Coppell, Texas 75019.

## JURISDICTION AND VENUE

3.     This Court has personal jurisdiction over Defendant pursuant to 735 ILCS 5/2-209(a)(1) (transaction of any business within this State), section 2-209(a)(7) (the making or performance of any contract or promise substantially connected with this State), section 2-

209(b)(4) (corporation doing business within this State), and section 2-209(c) (any other basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States).

4.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because one of Plaintiff's causes of action arises under federal law.  This Court has supplemental jurisdiction over Plaintiff's remaining causes of action pursuant to 28 U.S.C. § 1367(a).

5.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions that give rise to Plaintiff's claim took place in this District.

## NATURE OF THE ACTION

6.      Defendant is a mortgage loan "servicer."  At all times relevant herein, Defendant was the servicer of Plaintiff's and Class (defined *infra*) members' notes, and mortgages on real property that secure those notes (collectively referred to hereinafter as the "loans").

7.      As part of Defendant's duties as a mortgage loan servicer, Defendant is responsible for collecting periodic (*e.g.*, monthly) payments from Plaintiff and Class members towards the outstanding balance of the loans ("Loan Payments").  Those Loan Payments also included monies to be held in escrow by Defendant, which are then used by Defendant to pay property taxes and homeowner's insurance premiums on behalf of the borrower.

8.      Individuals with loans serviced by Defendant—*e.g.*, Plaintiff and Class members—can choose to set up recurring payments that are automatically withdrawn from their bank accounts on preset date each month, but are not required to do so.  Instead, Defendant's customers may choose to make "one-off" Loan Payments each month, either (1) telephonically, by calling and providing Defendant with payment information, (2) by sending Defendant a check, or (3) online, by providing Defendant with payment information through its website.

9.     Regardless of whether Defendant's customers choose to set up recurring Loan Payments, or simply decide to make "one-off" Loan Payments each month, they do so with the understanding and intent that each Loan Payment will constitute a single withdrawal for the precise amount that they specified.

10.     Here, however, using the payment information (*i.e.*, bank account information) provided by Plaintiff and Class members in connection with their Loan Payments, Defendant triggered *multiple* withdrawals from Plaintiff's and Class members' bank accounts.  In other words, Plaintiff's and Class members' bank accounts were charged twice or more (the "Additional Charges"), even though they only should have been charged once.

11.     Plaintiff and Class members did not authorize, consent to, or approve of these Additional Charges, and only authorized a single Loan Payment to be charged to their bank accounts in the amount that they specified.

12.     As a result of these Additional Charges, the funds available in Plaintiff's and Class members' bank accounts were severely depleted, leaving Plaintiff and Class members with little to no money for other necessary expenditures.  Naturally, the Additional Charges severely distressed Plaintiff and Class members, as they wondered whether they would be able to afford basic necessities and satisfy their other financial obligations.  In some instances, the Additional Charges caused Class members' bank accounts to become overdrawn, leading to "insufficient funds" charges being imposed against them.

13.     Therefore, as a direct and proximate result of Defendant's conduct—*i.e.*, the unauthorized Additional Charges it imposed against Plaintiff and Class members—Plaintiff and Class members suffered mental and emotional anguish, as well as other economic and non-economic damages.

14.     Accordingly, Plaintiff, individually, and on behalf of the Class, seeks redress for these unauthorized Additional Charges, including damages for the mental and emotional anguish that Plaintiff and Class members suffered, as well as for other economic and non-economic damages that the Additional Charges caused.

## FACTS RELEVANT TO PLAINTIFF

15.     At all times relevant herein, Defendant was the servicer of Plaintiff's loan ("Plaintiff's Loan").

16.     Pursuant to the terms of Plaintiff's Loan, Plaintiff is required to make monthly Loan Payments.  A portion of Plaintiff's Loan Payments are held in escrow, and those funds are then used by Defendant to pay property taxes and homeowner's insurance premiums on Plaintiff's behalf.

17.     Plaintiff never authorized automatic, recurring payments on Plaintiff's Loan. Instead, each month, Plaintiff either (a) calls Defendant and provides it with payment information (such as her bank account number, the amount of the payment, etc.) to make her monthly Loan Payment, or (b) sends a check—which also contains her bank account number, the amount of the payment, etc.—to Defendant.

18.     In approximately March or April 2021, Defendant informed Plaintiff that the projected balance of her mortgage escrow account would fall below the required minimum balance.  As a result, Plaintiff was obligated to remit an additional Loan Payment that would be held entirely in escrow by Defendant ("Escrow Payment").

19.      On or about April 15, 2021, Plaintiff called Defendant to make her Escrow Payment.  Plaintiff authorized, consented to, and approved of a single Escrow Payment in the amount of $1,037.00.

20.     On April 19, 2021, a single Escrow Payment in the amount of $1,037.00 was withdrawn from Plaintiff's bank account by Defendant.  This debit was proper, as it was authorized, consented to, and approved by Plaintiff.

21.     However, on April 26, 2021, Defendant initiated *another* withdrawal in the amount of $1,037.00.  In other words, Plaintiff was subjected to an Additional Charge in the month of April 2021.

22.     Plaintiff did not authorize, consent to, or approve of this Additional Charge, and only authorized a single Escrow Payment in the amount of $1,037.00 to be charged to her bank account (*i.e.*, the one that was processed on April 19, 2021).

23.     As a result of this Additional Charge, the funds available in Plaintiff's bank account were severely depleted, leaving Plaintiff with little to no money for other necessary expenditures.  This Additional Charge severely distressed Plaintiff, as she wondered whether she would be able to afford basic necessities and satisfy her other financial obligations.

24.     Moreover, due to the potential imposition of bounced check fees, late fees, and other charges against Plaintiff's bank account, and the effect of the Additional Charge on Plaintiff's ability to meet her other financial obligations, Plaintiff spent time tracking the available funds in her bank account, checking the account online to determine if any other payments had been declined, and reaching out to her bank about Defendant's erroneous withdrawal. Plaintiff earns approximately $40.00 per hour, and the time she spent dealing with Nationstar's actions diminished the amount of money she could earn for herself at work.

25.     Finally, Plaintiff's bank account is an interest-bearing account, such that the Additional Charge reduced the amount of interest that Plaintiff earned on the funds in her account.

26.     Therefore, as a direct and proximate result of Defendant's conduct—*i.e.*, the unauthorized Additional Charge it imposed—Plaintiff suffered mental and emotional anguish, as well as other economic and non-economic damages.

## CLASS ACTION ALLEGATIONS

27.     <u>Class Definition</u>. Plaintiff brings this action, pursuant to Fed. R. Civ. P. 23, on behalf of a nationwide class of similarly situated individuals and entities ("the Class"), defined as follows:

> All persons (1) who have (or had) a loan serviced by Defendant during the applicable statute of limitations period, (2) who authorized Defendant to withdraw funds from their bank accounts in connection with their Loan Payment obligations, and (3) whose bank accounts were charged by Defendant in excess of the amount that they authorized, consented to, and/or approved.

28.     Excluded from the Class are: (1) Defendant, Defendant's agents, subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest, and those entities' current and former employees, officers, and directors; (2) the Judge to whom this case is assigned and the Judge's immediate family; (3) any person who executes and files a timely request for exclusion from the Class; (4) any persons who have had their claims in this matter finally adjudicated and/or otherwise released; and (5) the legal representatives, successors and assigns of any such excluded person.

29.     <u>Subclass Definition</u>. Plaintiff also brings this action, pursuant to Fed. R. Civ. P. 23, on behalf of a subclass of similarly situated individuals and entities (the "Subclass"), defined as follows:

> All persons (1) who have (or had) a loan serviced by Defendant during the applicable statute of limitations period, (2) whose loan is for real property located in the state of Illinois, or who were residents of Illinois during the time period relevant to this action, (3)  who authorized Defendant to withdraw funds from their bank accounts in connection with their Loan Payment obligations, and (4) whose bank accounts

were charged by Defendant in excess of the amount that they authorized, consented to, and/or approved.

30. Excluded from the Subclass are: (1) Defendant, Defendant's agents, subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest, and those entities' current and former employees, officers, and directors; (2) the Judge to whom this case is assigned and the Judge's immediate family; (3) any person who executes and files a timely request for exclusion from the Subclass; (4) any persons who have had their claims in this matter finally adjudicated and/or otherwise released; and (5) the legal representatives, successors and assigns of any such excluded person.

31. Plaintiff hereby reserves the right to amend or modify the Class and Subclass definitions with greater specificity or division after having had an opportunity to conduct discovery.

32. <u>Numerosity</u>. The members of the Class are so numerous that the joinder of all members is impractical, as the Class is estimated to consist of hundreds of thousands of members. According to Defendant's website, as of March 31, 2021, Defendant had 3.5 million customers nationwide, and, as of December 31, 2020, was a top 15 mortgage loan originator and the 3rd largest mortgage loan servicer in the United States.[1] According to the U.S. Consumer Financial Protection Bureau ("CFPB"), "unauthorized duplicate-payment drafts by Mr. Cooper appear to have resulted in hundreds of thousands of consumers' bank accounts being debited for multiples of their mortgage payments. Affected consumers have reported being charged overdraft fees and likely suffered additional harm as a result of these unauthorized withdrawals."[2]

---

[1]  https://www.mrcooper.com/about_us/overview
[2]  https://www.consumerfinance.gov/about-us/newsroom/statement-by-cfpb-acting-director-dave-uejio-on-mr-cooper-unauthorized-withdrawals/

33.     Moreover, all members of the proposed Class are readily ascertainable. As the servicer of Plaintiff's and Class members' loans, Nationstar has access to Plaintiff's and Class members' names and addresses, as well as the number and amount of any Additional Charges it imposed against them. Using this information, Class members can be identified and ascertained for the purpose of providing notice and ultimate relief.

34.     <u>Commonality and Predominance</u>. This action involves common questions of law and fact that predominate over any questions affecting individual Class members. These common questions are appropriate for class certification because the resolution thereof would substantially advance the disposition of this matter and each party's interests herein.  These common questions include:

       a.     Whether Plaintiff and Class members had ownership of the funds in their bank accounts;

       b.     Whether Plaintiff and Class members gave Defendant authority, consent, and approval to withdraw monies from their bank accounts that exceeded the amounts they had specified;

       c.     Whether Defendant withdrew amounts from Plaintiff's and Class members' bank accounts that were in addition to amounts that Plaintiff and Class members had given Defendant consent, approval, and authorization to withdraw;

       d.     Whether, in withdrawing additional amounts from Plaintiff's and Class members' bank accounts that were in addition to amounts that Plaintiff and Class members had given Defendant consent, approval, and authorization to withdraw, Defendant exercised possession, custody, and

control over those funds, thereby depriving Plaintiff and Class members of possession, custody, and control over those funds;

e. Whether Defendant had a duty to utilize the financial information provided to it by Plaintiff and Class members responsibly and appropriately, and within the confines of the consent, authorization, and approval given to Defendant by Plaintiff and Class members;

f. Whether Defendant breached its duty to Plaintiff and Class members to utilize the financial information provided to it by Plaintiff and Class members responsibly and appropriately, and within the confines of the consent, authorization, and approval given to Defendant by Plaintiff and Class members, when it withdrew additional funds from Plaintiff's and Class members' bank accounts;

g. Whether it was foreseeable that Defendant's abuse of its position of trust, and misuse of the financial information that Plaintiff and Class members provided to it, would result in harm to Plaintiff and Class members;

h. Whether, in breaching the duty it owed to Plaintiff and Class members, Defendant caused harm to Plaintiff and Class members;

i. Whether, in engaging in the conduct at issue in this case, Defendant acted with malice and wantonness, and in the presence of other aggravating circumstances;

j. Whether Plaintiff and Class members were injured and suffered damages or other losses because of Defendant's actions as described herein; and

k. Whether Plaintiff and Class members are entitled to damages, and the measure and amount of those damages.

35.     <u>Typicality</u>. Plaintiff's claims are typical of those of other Class members. Plaintiff was a customer of Nationstar who was subjected to Additional Charges to which she did not consent or authorize.   As such, Plaintiff's claims arise from the same factual circumstances as the claims of other Class members, and her damages and injuries are akin to those of other Class members. Plaintiff seeks relief consistent with the relief sought by the Class.

36.     <u>Adequacy</u>. Plaintiff is an adequate representative of the Class because she is a member of the Class that she seeks to represent, is committed to pursuing this matter against Nationstar to obtain relief for the Class, and has no conflicts of interest with the Class. Moreover, Plaintiff's attorneys are competent and experienced in litigating class actions such as this one. Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect Class members' interests.

37.     <u>Superiority</u>. A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The quintessential purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to an individual plaintiff may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiff and the Class are relatively small compared to the burden and expense required to individually litigate their claims against Defendant, and thus, individual litigation to redress Defendant's wrongful conduct would be impracticable. Individual litigation by each Class member would also strain the court system. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

## COUNT I
## NEGLIGENCE
### (On Behalf of Plaintiff and the Class)

38.     Plaintiff repeats and re-alleges the allegations of the paragraphs 1-37 with the same force and effect as though fully set forth herein.

39.     In providing Defendant with the financial information necessary to make their Loan Payments, Plaintiff and Class members entrusted Defendant with that financial information and reasonably believed and expected that Defendant would utilize that information appropriately—*i.e.*, Defendant would use it to withdraw the funds that Plaintiff and Class members had authorized, and *only* those funds.

40.     As such, in acquiring Plaintiff's and Class members' financial information for that particular purpose, Defendant acquired a duty to utilize that financial information responsibly and appropriately, and within the confines of the consent, authorization, and approval given to Defendant by Plaintiff and Class members.

41.     State and federal law also imposed a duty on Defendant to prevent the misuse of Plaintiff's and Class members' financial information.  For example, pursuant to the Personal Information Privacy Act ("PIPA")—codified as 815 ILCS 530/1, *et seq.*—"a data collector that…maintains or stores…records that contain personal information concerning an Illinois resident shall implement and maintain reasonable security measures to protect those records from unauthorized access, acquisition, destruction, use, modification, or disclosure." 815 ILCS 530/45(a).

42.     Plaintiff's and Class members' financial information is "personal information," as that term is defined by PIPA.  815 ILCS 530/5.

43.     Since Defendant "handles, collects, disseminates, or otherwise deals with nonpublic personal information"—*e.g.*, Plaintiff's and Class members' financial information—

in connection with its mortgage servicing activities, Defendant is a "data collector," as that term is defined by PIPA. 815 ILCS 530/5.

44.     As such, PIPA required Defendant to "implement and maintain reasonable security measures to protect those records from unauthorized…use." 815 ILCS 530/45(a).

45.     In breach of these common law and statutory duties, Defendant misused Plaintiff's and Class members' financial information to impose Additional Charges that resulted in funds being withdrawn from Plaintiff's and Class members' bank accounts in the absence of consent, authorization, and approval given to Defendant by Plaintiff and Class members.

46.     In breaching the duties it owed to Plaintiff and Class members, Defendant acted with malice, wantonness, and in the presence of other aggravating circumstances. In short, Plaintiff and Class members trusted Defendant with their financial information and reasonably believed and expected that Defendant would utilize that information appropriately. However, Defendant abused Plaintiff's and Class members' trust, and utilized their financial information for its own gain—namely, taking funds from their bank accounts to which Defendant was not entitled.

47.     Defendant knew that Plaintiff and Class members had not authorized, consented to, or approved of Defendant's exercise of possession, custody, and control over those funds. Yet, Defendant withdrew those funds anyway, using the financial information that Plaintiff and Class members had provided and entrusted to Defendant.

48.     Defendant, as one of the largest mortgage loan originators and servicers in the country, knows that for many individuals—such as Plaintiff and members of the Class—a monthly Loan Payment is one of the biggest expenditures (if not the biggest expenditure) an individual will be required to make in a given month. Defendant also knows that, in purchasing a home, consumers—such as Plaintiff and members of the Class—usually select the highest

valued property that is still within their means. As such, Defendant knows that Loan Payments represent the maximum amount that a reasonable consumer can afford in a given month, and that many consumers—such as Plaintiff and members of the Class—cannot afford to make two (or more) Loan Payments in a given month.

49. For the same reasons, Defendant knew that the Additional Charges would severely deplete the available funds in Plaintiff's and Class members' bank accounts, and, in many instances, overdraw those accounts.

50. Yet, despite knowing the disastrous financial consequences that its actions would have on Plaintiff and Class members, and the emotional distress that those actions would cause Plaintiff and Class members to endure, Defendant chose to impose the Additional Charges and take monies that were sorely needed by Plaintiff and Class members for other common household expenses and financial obligations.

51. Therefore, Defendant acted with malice and wantonness, and in the presence of other aggravating circumstances. For the same reasons, it was foreseeable that Defendant's abuse of its position of trust, and misuse of the financial information that Plaintiff and Class members provided to it, would result in harm to Plaintiff and Class members.

52. As a direct and proximate result of Defendant's negligence—*i.e.*, the authorized Additional Charges it imposed on Plaintiff and Class members—Plaintiff and Class members suffered mental and emotional anguish, as well as other economic and non-economic damages, including lost interest on those funds, and "insufficient funds" charges imposed by their banks. Indeed, had Defendant *not* improperly withdrawn funds from Plaintiff's and Class members' bank accounts, Plaintiff and Class members would not have suffered the mental and emotional anguish described herein, and, in many cases, would have received interest on the funds in those

accounts and/or would *not* have been liable for any "insufficient funds" charges imposed by their banks.

## COUNT II
## TRESPASS TO CHATTELS
### (On Behalf of Plaintiff and the Class)

53.     Plaintiff repeats and re-alleges the allegations of the paragraphs 1-37 with the same force and effect as though fully set forth herein.

54.     Although "there is sparse Illinois case law from the last century addressing the elements of trespass to personal property"—*i.e.*, trespass to chattels—the few Illinois courts presented with such a claim have followed the Restatement. *Sotelo v. DirectRevenue, LLC*, 384 F.Supp.2d 1219, 1229 (N.D. Ill. 2005); *Loman v. Freeman*, 375 Ill. App. 3d 445, 458 (4th Dist. 2006) (*aff'd*, 229 Ill.2d 104 (2008)).[3]

55.     Under the Restatement, "a trespass to a chattel may be committed by intentionally (a) dispossessing another of the chattel, or (b) using or intermeddling with a chattel in the possession of another." *Sotelo*, 384 F.Supp.2d at 1229 (quoting Restatement (Second) of Torts § 217).

56.     Although similar to the tort of conversion, the tort of trespass to chattels addresses even "minor and unimportant dispossessions" that "do not amount to conversion," and "allows recovery of damages for the interference with the possession." Restatement (Second) of Torts § 222, comment a; *Loman*, 375 Ill.App.3d at 458 ("If one cuts, carves, lacerates, incises, or otherwise alters someone else's property except as authorized by that person, one commits a

---

[3] There are several unpublished Illinois cases recognizing a trespass to chattels claim as well. *E.g.*, *Burks v. Lex Special Assets, LLC*, 2017 IL App (1st) 161556-U, ¶ 31; *Ogbolumani v. Young*, 2015 IL App (1st) 141930-U, ¶¶ 29-32.

classic tort: either trespass to chattels or conversion, depending on the extent of the alteration."); *Sotelo*, 384 F.Supp.2d at 1229-30.

57.     Given the difference between conversion and trespass to chattels, a claim for trespass to chattels does not required a plaintiff to "allege that he made any demand for or was refused the return of his property, which is an element of a conversion claim." *Sotelo*, 384 F.Supp.2d at 1229.

58.     Under Illinois law, money "is capable of being described as a specific chattel" where it is "capable of being described, identified, or segregated in a specific manner." *E.g.*, *Bill Marek's The Competitive Edge, Inc. v. Mickelson Group, Inc.*, 346 Ill.App.3d 996, 1003 (2nd Dist. 2004); *Roderick Dev. Inv. Co., Inc. v. Cmty. Bank of Edgewater*, 282 Ill.App.3d 1052, 1058-1060 (1st Dist. 1996) (citing, *inter alia*, *Addante v. Pompilio*, 303 Ill.App. 172 (1st Dist. 1940), wherein "the court held that the defendant converted $3,000 the plaintiff gave the defendant to transmit to his brother in Italy" because it was a specifically identifiable sum).

59.     Here, Plaintiff and Class members had ownership and possession over the monies in their bank accounts.

60.     In consenting to, authorizing, and approving of Defendant's withdrawal of their monthly Loan Payments (or some other amount) from their bank accounts, Plaintiff and Class members transferred their right of possession to those sums to Defendant.

61.     However, Plaintiff and Class members did not consent to, authorize, or approve of the Additional Charges which went beyond their monthly Loan Payment obligations (or any other amount that they specified).

62.     Accordingly, in withdrawing money from Plaintiff's and Class members' bank accounts in connection with the Additional Charges, Defendant unlawfully dispossessed

Plaintiff and Class members of these additional funds, and interfered with their right of possession. *See*, *Loman*, 375 Ill.App.3d at 458.

63. The dispossessed funds at issue had a specific source—*i.e.*, Plaintiff's and Class members' bank accounts—and a specific destination—*i.e.*, Defendant's bank account. The dispossessed funds were in a specific amount, as well. In Plaintiff's case, the specific amount of the dispossessed funds was $1,037.00.

64. Defendant's unlawful interference with Plaintiff's and Class members' possessory interest in those funds was done with malice, wantonness, and in the presence of other aggravating circumstances. In short, Plaintiff and Class members trusted Defendant with their financial information and reasonably believed and expected that Defendant would utilize that information appropriately. However, Defendant abused Plaintiff's and Class members' trust, and utilized their financial information for its own gain—namely, taking funds from their bank accounts to which Defendant was not entitled.

65. At the time it dispossessed Plaintiff and Class members of their funds, Defendant knew that Plaintiff and Class members had not authorized, consented to, or approved of Defendant's exercise of possession, custody, and control over those funds. Yet, Defendant withdrew those funds anyway, using the financial information that Plaintiff and Class members had provided and entrusted to Defendant.

66. Defendant, as one of the largest mortgage loan originators and servicers in the country, knows that for many individuals—such as Plaintiff and members of the Class—a monthly Loan Payment is one of the biggest expenditures (if not the biggest expenditure) an individual will be required to make in a given month. Defendant also knows that, in purchasing a home, consumers—such as Plaintiff and members of the Class—usually select the highest valued property that is still within their means. As such, Defendant knows that Loan Payments

represent the maximum amount that a reasonable consumer can afford in a given month, and that many consumers—such as Plaintiff and members of the Class—cannot afford to make two (or more) Loan Payments in a given month.

67.     For the same reasons, Defendant knew that the Additional Charges would severely deplete the available funds in Plaintiff's and Class members' bank accounts, and, in many instances, overdraw those accounts.

68.     Yet, despite knowing the disastrous financial consequences that its actions would have on Plaintiff and Class members, and the emotional distress that those actions would cause Plaintiff and Class members to endure, Defendant chose to impose the Additional Charges and convert monies that were sorely needed by Plaintiff and Class members for other common household expenses and financial obligations.

69.     Therefore, in unlawfully acquiring possession of the funds at issue in this case, Defendant acted with malice and wantonness, and in the presence of other aggravating circumstances.

70.     As a direct and proximate result of Defendant's conduct—*i.e.*, the authorized Additional Charges it imposed on Plaintiff and Class members—Plaintiff and Class members suffered mental and emotional anguish, as well as other economic and non-economic damages, including lost interest on those funds, and "insufficient funds" charges imposed by their banks.

**COUNT III**
**BREACH OF FIDUCIARY DUTY**
**(On Behalf of Plaintiff and the Class)**

71.     Plaintiff repeats and re-alleges the allegations of the paragraphs 1-37 with the same force and effect as though fully set forth herein.

72.     "To state a claim for breach of fiduciary duty, it must be alleged and ultimately proved: (1) that a fiduciary duty exists; (2) that the fiduciary duty was breached; and (3) that

such breach proximately caused the injury of which the party complains." *E.g.*, *Lawlor v. N. Am. Corp. of Illinois*, 2012 IL 112530, ¶ 69.

73.     As explained below, Defendant, as the servicer of Plaintiff's and Class members' loans, owed a fiduciary duty to Plaintiff and Class members.

74.     Under Illinois law, "escrowees have been found to owe a fiduciary duty both to the party making the deposit and the party for whose benefit it is made." *E.g.*, *Int'l Capital Corp. v. Moyer*, 347 Ill.App.3d 116, 123 (1st Dist. 2004); *231 W. Scott, LLC v. Lakeside Bank*, 2017 IL App (1st) 161131, ¶ 32 ("In this case, there is no question that, as escrowee, [the escrowee] owed a fiduciary duty to both the party making the deposit[] and the party for whose benefit the deposit was made.").

75.     Here, in its capacity as the servicer of Plaintiff's and Class members' loans, Defendant collected and held monies in escrow on behalf of Plaintiff and Class members, which were then used by Defendant to pay property taxes and homeowner's insurance premiums on behalf of Plaintiff and Class members.

76.     Defendant acted as the escrowee with respect to these escrow monies, and was responsible for using those funds to pay the tax collectors and insurers of Plaintiff's and Class members' properties directly.

77.     Since a portion of Plaintiff's and Class members' monthly Loan Payments was to be held in escrow by Defendant for purposes of, *inter alia*, paying for homeowner's insurance and real estate taxes on Plaintiff's and Class members' properties, Defendant owed a fiduciary duty to Plaintiff and Class members.

78.     Moreover, as discussed above, when Plaintiff and Class members provided Defendant with the financial information necessary to process their Loan Payments, Plaintiff and Class members placed a special trust and confidence in Defendant to utilize that information

appropriately, and only initiate financial transactions that Plaintiff and Class members had authorized, consented to, or approved of.

79.     As such, in acquiring Plaintiff's and Class members' financial information for that particular purpose, Defendant acquired a fiduciary duty to utilize that financial information responsibly and appropriately, and within the confines of the consent, authorization, and approval given to Defendant by Plaintiff and Class members.

80.     In breach of that fiduciary duty, Defendant misused Plaintiff's and Class members' financial information to impose Additional Charges that resulted in funds being withdrawn from Plaintiff's and Class members' bank accounts in the absence of consent, authorization, and approval given to Defendant by Plaintiff and Class members. *See*, *Conant v. Karris*, 165 Ill.App.3d 783, 791 (1st Dist. 1987) (holding that misuse of confidential information constitutes breach of fiduciary duty).

81.     In breaching the fiduciary duties it owed to Plaintiff and Class members, Defendant acted with malice, wantonness, and in the presence of other aggravating circumstances.  In short, Plaintiff and Class members trusted Defendant with their financial information and reasonably believed and expected that Defendant would utilize that information appropriately.  However, Defendant abused the special confidence and trust placed in it by Plaintiff and Class members, and utilized their financial information for its own gain—namely, taking funds from their bank accounts to which Defendant was not entitled.

82.     Defendant knew that Plaintiff and Class members had not authorized, consented to, or approved of Defendant's exercise of possession, custody, and control over those funds. Yet, Defendant withdrew those funds anyway, using the financial information that Plaintiff and Class members had provided and entrusted to Defendant.

83.     Defendant, as one of the largest mortgage loan originators and servicers in the country, knows that for many individuals—such as Plaintiff and members of the Class—a monthly Loan Payment is one of the biggest expenditures (if not the biggest expenditure) an individual will be required to make in a given month.  Defendant also knows that, in purchasing a home, consumers—such as Plaintiff and members of the Class—usually select the highest valued property that is still within their means.  As such, Defendant knows that Loan Payments represent the maximum amount that a reasonable consumer can afford in a given month, and that many consumers—such as Plaintiff and members of the Class—cannot afford to make two (or more) Loan Payments in a given month.

84.     For the same reasons, Defendant knew that the Additional Charges would severely deplete the available funds in Plaintiff's and Class members' bank accounts, and, in many instances, overdraw those accounts.

85.     Yet, despite knowing the disastrous financial consequences that its actions would have on Plaintiff and Class members, and the emotional distress that those actions would cause Plaintiff and Class members to endure, Defendant chose to impose the Additional Charges and take monies that were sorely needed by Plaintiff and Class members for other common household expenses and financial obligations.

86.     Therefore, Defendant acted with malice and wantonness, and in the presence of other aggravating circumstances.  For the same reasons, it was foreseeable that Defendant's abuse of its position of trust, and misuse of the financial information that Plaintiff and Class members provided to it, would result in harm to Plaintiff and Class members.

87.     As a direct and proximate result of Defendant's breach of fiduciary duty—*i.e.*, the authorized Additional Charges it imposed on Plaintiff and Class members—Plaintiff and Class members suffered mental and emotional anguish, as well as other economic and non-

economic damages, including lost interest on those funds, and "insufficient funds" charges imposed by their banks. Indeed, had Defendant *not* improperly withdrawn funds from Plaintiff's and Class members' bank accounts, Plaintiff and Class members would not have suffered the mental and emotional anguish described herein, and, in many cases, would have received interest on the funds in those accounts and/or would *not* have been liable for any "insufficient funds" charges imposed by their banks.

**COUNT IV**
**Violation of 12 U.S.C. § 2605(k)(1)(E)**
**(On Behalf of Plaintiff and the Class)**

88. Plaintiff repeats and re-alleges the allegations of the paragraphs 1-37 with the same force and effect as though fully set forth herein.

89. The Real Estate Settlement Procedures Act ("RESPA")—codified as 12 U.S.C. §§ 2601, *et seq.*—"is a consumer protection statute that regulates the real estate settlement process, including servicing of loans and assignment of those loans." *E.g.*, *Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676, 680 (7th Cir. 2011). Since "Congress intended RESPA to serve consumer-protection purposes[,] RESPA's provisions relating to loan servicing procedures should be 'construed liberally' to serve the statute's remedial purpose." *E.g.*, *Medrano v. Flagstar Bank, FSB*, 704 F.3d 661, 665-666 (9th Cir. 2012) (citations omitted).

90. In January 2013, pursuant to the authority granted by the Dodd-Frank Wall Street Reform and Consumer Protection Act—Public Law No. 111-203, 124 Stat. 1376 (2010)—the CFPB issued a number of final rules concerning mortgage markets in the United States—known as "Regulation X" and codified as 12 C.F.R. § 1024.1, *et seq.* Regulation X became effective on January 10, 2014, and is intended to carry out RESPA's consumer protection purposes. 12 C.F.R. § 1024.1.

91.     The requirements of Regulation X carry the force of law because because RESPA makes it unlawful for a servicer to "fail to comply with any other obligation found by the [CFPB], by regulation, to be appropriate to carry out the consumer protection purposes of this chapter." 12 U.S.C. § 2605(k)(1)(E).

92.     Defendant is a mortgage "servicer" as that term is defined by 12 C.F.R. § 1024.2(b) and 12 U.S.C. § 2605(i)(2). At all times relevant herein, Defendant was the servicer of Plaintiff's and Class members' loans.

93.     Plaintiffs' and Class members' loans are each a "federally related mortgage loan" as defined by RESPA and Regulation X. 12 U.S.C. § 2602(1); 12 C.F.R. § 1024.2(b).

94.     Pursuant to RESPA and Regulation X, mortgage loan servicers—such as Defendant—are generally prohibited from "charg[ing] [a] borrower a monthly sum [exceeding] one-twelfth (1/12) of the total annual escrow payments which the servicer reasonably anticipates paying from the account." 12 C.F.R. § 1024.17(c)(1)(ii); *see also*, 12 U.S.C. § 2609(a)(2).[4]

---

[4] While, in some instances, a borrower's monthly escrow payment may permissibly exceed one-twelfth of that borrower's annual estimated escrow payments, any such excess is relatively minimal. For example, a servicer may collect slightly more than one-twelfth of the annual estimated total escrow payments each month in order "to maintain a cushion no greater than one-sixth (1/6) of the estimated total annual payments from the account." *Id.* But, this "cushion" is to be paid over the course of a year, such that it can only increase a monthly escrow payment by one-seventy-second (1/72) of total estimated escrow payments to be paid by the borrower over the course of a year—*i.e.*, one-sixth (1/6) multiplied by one-twelfth (1/12). Similarly, if the amount of a borrower's annual estimated escrow payments changes—due to an increase in property taxes, for example—such that there is a shortage of escrow funds held on behalf of a borrower in comparison to the amounts that are projected to be paid out of that escrow fund, a servicer may require a borrower to repay the shortage. 12 C.F.R. § 1024.17(f)(3). However, a servicer can only require the repayment of any such shortage within 30 days if the amount of the shortage is *less* than the borrower's monthly escrow payment (12 C.F.R. § 1024.17(f)(3)(i)(B)); otherwise, the shortage can only be collected in installments over the course of 12 months (12 C.F.R. § 1024.17(f)(3)(ii)(B)). Accordingly, even where there is a shortage of escrow funds held on behalf of a borrower, any additional escrow payments will be relatively minimal.

95.     Since Regulation X imposes "obligation[s] found by the [CFPB], by regulation, to be appropriate to carry out the consumer protection purposes of" RESPA, a violation of Regulation X—and, more specifically, 12 C.F.R. § 1024.17—constitutes a violation of 12 U.S.C. § 2605(k)(1)(E).

96.     As noted above, a portion of Plaintiff's and Class members' Loan Payments included monies to be held in escrow by Defendant, which were then to be used by Defendant to pay property taxes and homeowner's insurance premiums on their behalf.

97.     The amount of Plaintiff's and Class members' regular Loan Payments that were attributable to escrow was the *maximum* monthly amount permitted by RESPA and Regulation X.

98.     Accordingly, by debiting the Additional Charges from Plaintiff's and Class members' bank accounts, Defendant collected *more* than the maximum allowable monthly escrow payment amount from Plaintiff and Class members.

99.     Defendant's conduct was part of a pattern and practice of non-compliance with RESPA and Regulation X.   Indeed, according to the CFPB, "*hundreds of thousands of consumers*" were "debited for multiples of their mortgage payments."[5] (emphasis added).

100.    As a result of Defendant's actions, Defendant is liable to Plaintiff and Class members for actual damages, statutory damages, costs, and attorney fees. 12 U.S.C. §§ 2605(f)(2)-(3).

---

[5]   https://www.consumerfinance.gov/about-us/newsroom/statement-by-cfpb-acting-director-dave-uejio-on-mr-cooper-unauthorized-withdrawals/

**COUNT V**
**(On Behalf of Plaintiff and the Illinois Subclass)**
**Violation of the Illinois Consumer Fraud and Deceptive Trade Practices Act**
**(815 ILCS 505/1, *et seq.*)**

101.    Plaintiff repeats and re-alleges the allegations of the paragraphs 1-100 with the same force and effect as though fully set forth herein.

102.    The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1, *et seq.*, provides protection to consumers by mandating fair competition in commercial markets for goods and services.

103.    The ICFA prohibits unlawful and unfair business acts or practices "in the conduct of any trade or commerce." 815 ILCS 505/2.

104.    Defendant, Plaintiff, and Subclass members are each a "person" as defined by section 505/1(c) of the ICFA.

105.    As a mortgage loan servicer, Defendant was engaged in trade and commerce because it collected debts on behalf of the owners of Plaintiff's and Subclass members' loans. *See, e.g.*, *Thrasher-Lyon v. Illinois Farmers Ins. Co.*, 861 F.Supp.2d 898, 909 (N.D. Ill. 2012) ("The Illinois Supreme Court has found that debt collection practices are embraced by the ICFA.").

106.    Plaintiff and Subclass members are residents of, or own real property located within, the state of Illinois.

107.    Under the ICFA, business practices are "unfair" if they (1) offend public policy, (2) are immoral, unethical, oppressive, or unscrupulous, and/or (3) cause substantial injury to consumers. *E.g.*, *Robinson v. Toyota Motor Credit Corp.*, 201 Ill.2d 403, 417-18 (2002). As set forth below, Defendant's conduct meets all three of these prongs.

108.    "The public policy of Illinois is to be found in its constitution, its statutes and its judicial decisions." *E.g.*, *Hyatte v. Quinn*, 239 Ill.App.3d 893, 898 (2nd Dist. 1993); *Chicago*

*Fire Fighters Union Local No. 2 v. City of Chicago*, 323 Ill.App.3d 168, 176 (1st Dist. 2001) ("To ascertain the existence of public policy, we look to our constitution, statutes, and relevant judicial opinions.").

109. Relevant here, state and/or federal law prohibit: (1) the misuse of personal financial information (*E.g.*, 815 ILCS 530/45(a)); (2) dispossessing or interfering with another's possession of a chattel (*E.g.*, *Sotelo*, 384 F.Supp.2d at 1229 (quoting Restatement (Second) of Torts § 217)); and (3) charging mortgage escrow account payments in excess of the maximums established by RESPA and Regulation X (*E.g.*, 12 C.F.R. § 1024.17(c)(1)(ii); 12 U.S.C. § 2609(a)(2)).

110. As established above, Defendant's conduct complained of herein violated these sources of law, and therefore, violated Illinois public policy.

111. Defendant's conduct was also immoral, unethical, oppressive, and unscrupulous, and caused substantial injury to Plaintiff and Subclass members.

112. Defendant knew that Plaintiff and Subclass members had not authorized, consented to, or approved of Defendant's imposition of the Additional Charges, but nevertheless withdrew those funds from Plaintiff's and Subclass members' bank accounts anyway, using the financial information that Plaintiff and Subclass members had provided and entrusted to Defendant.

113. In other words, Defendant abused the trust that Plaintiff and Subclass members placed in it and utilized their financial information for its own gain—namely, taking funds from their bank accounts to which Defendant was not entitled.

114. Defendant, as one of the largest mortgage loan originators and servicers in the country, knows that for many individuals—such as Plaintiff and members of the Subclass—a monthly Loan Payment is one of the biggest expenditures (if not the biggest expenditure) an

individual will be required to make in a given month.  Defendant also knows that, in purchasing a home, consumers—such as Plaintiff and members of the Subclass—usually select the highest valued property that is still within their means.  As such, Defendant knows that Loan Payments represent the maximum amount that a reasonable consumer can afford in a given month, and that many consumers—such as Plaintiff and members of the Subclass—cannot afford to make two (or more) Loan Payments in a given month.

115.    For the same reasons, Defendant knew that the Additional Charges would severely deplete the available funds in Plaintiff's and Subclass members' bank accounts, and, in many instances, overdraw those accounts.

116.    Yet, despite knowing the disastrous financial consequences that its actions would have on Plaintiff and Subclass members, and the emotional distress that those actions would cause Plaintiff and Subclass members to endure, Defendant chose to impose the Additional Charges and take monies that were sorely needed by Plaintiff and Subclass members for other common household expenses and financial obligations.

117.    Therefore, Defendant's conduct was unfair and violated the ICFA.

118.    As a direct and proximate result of Defendant's breach of the ICFA—*i.e.*, the unauthorized Additional Charges it imposed on Plaintiff and Subclass members—Plaintiff and Subclass members suffered mental and emotional anguish, as well as other economic and non-economic damages, including lost interest on those funds, and "insufficient funds" charges imposed by their banks.  Indeed, had Defendant *not* improperly withdrawn funds from Plaintiff's and Subclass members' bank accounts, Plaintiff and Subclass members would not have suffered the mental and emotional anguish described herein, and, in many cases, would have received interest on the funds in those accounts and/or would *not* have been liable for any "insufficient funds" charges imposed by their banks.

WHEREFORE, Plaintiff, on behalf of herself and all others similarly situated, respectfully requests the following relief:

A.   Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23, and certifying the Class and the Illinois Subclass, as defined herein;

B.   Designating Plaintiff as representative of the Class and the Illinois Subclass and her undersigned counsel as Class Counsel;

C.   Entering judgment in favor of Plaintiff, the Class, and the Illinois Subclass and against Defendant;

D.   Awarding Plaintiff, the Class, and the Illinois Subclass actual damages, statutory damages, nominal damages, compensatory damages, and consequential damages in an amount to be determined, as allowable by law;

E.   Awarding Plaintiff, the Class, and the Illinois Subclass attorneys' fees and costs, including interest thereon, as allowed or required by law; and

F.   Granting all such further and other relief as the Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff, individually, and on behalf of the Class and the Illinois Subclass, demands a trial by jury on all issues so triable.

Plaintiff LATREECE JONES, individually, and on behalf of all others similarly situated,

By: s/ Thomas A. Zimmerman, Jr.
    Thomas A. Zimmerman, Jr. (IL 6231944)
    *tom@attorneyzim.com*
    Sharon A. Harris
    *sharon@attorneyzim.com*
    Matthew C. De Re
    *matt@attorneyzim.com*
    Jeffrey D. Blake
    *jeff@attorneyzim.com*
    **ZIMMERMAN LAW OFFICES, P.C**.
    77 W. Washington Street, Suite 1220
    Chicago, Illinois 60602

(312) 440-0020 telephone
(312) 440-4180 facsimile
www.attorneyzim.com

Marc E. Dann (OH 0039425)
*mdann@dannlaw.com*
Brian D. Flick (OH 0081605)
*bflick@dannlaw.com*
**DANNLAW**
P.O. Box 6031040
Cleveland, OH 44103
Telephone: (216) 373-0539
Facsimilie: (216) 373-0536

Counsel for Plaintiff, the putative Class, and the putative Illinois Subclass